UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KINGSWOOD CAPITAL PARTNERS LLC, and BENCHMARK INVESTMENTS, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>MIAMI LIFE, INC. and MICHAEL SNYDER,<br><br>Defendants. | Civil Action No. 22-cv-5078<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Through its attorneys, Plaintiffs Kingswood Capital Partners LLC and Benchmark Investments, LLC (together, "**Kingswood**") allege the following "**Complaint**:"

1. This case is about anti-Semitism.

2. In April 2022, Kingswood arranged for Defendant Miami Life, Inc. ("**ML**") to participate in a $400 million "**Transaction**."

3. In exchange, ML cut Kingswood out of the Transaction's $9 million referral fee—just because Defendant Michael Snyder hates Jews:

> On Jun 4, 2022, at 8:35 PM, Michael Snyder <michael.snyder@mdsed.com> wrote:
>
> Shameful that Benchmark has not asked for Miami Life's wiring instructions, my attorneys are gonna have a field day serving you and your Jew boss discovery that's gonna delete you guys (sound familiar either than this isnt a baseless threat it's a fact). Hope your check book can keep up to your NYC big pussy mouths you pint ass little piece of sidewalk gravels.
>
> Miami Life wants $1 Million to settle and we will be looking for 2.5x in court. Enjoy Asswipes
>
> My litigator is a major asshole. He will burn BURN "dickbench" DOWN !!!!!!!
>
> 
>
> On Jun 3, 2022, at 7:53 PM, Douglas Blake <dblake@benchmarkinvestments.com> wrote:
>
> Unfortunately Camshaft did not honor the attached Deal Summary, to the best of my knowledge. I have no knowledge of what actually transpired because EF Hutton has an NDA with Camshaft and per Jimmy you have an NDA with Camshaft. I can only speculate, but as I am not a registered principal at my firm or named party in any of these transactions I have no formal knowledge and would not be in a position to acknowledge or dispute anything.

1

4. Mr. Snyder then threatened to report Kingswood to the Securities and Exchange Commission ("**SEC**") and Financial Industry Regulatory Authority ("**FINRA**"), claiming, without elaboration or explanation, that Kingswood had "just violated major laws."

5. Mr. Snyder's only reason for making this threat appears to be his opinion that Kingswood is comprised of "you Jew little pieces for fucking gravel," whatever that means:



6. Upon information and belief, ML and Mr. Snyder (together, the "**Snyder Parties**") did file baseless reports of Kingswood's nonexistent wrongdoing with the SEC and FINRA, which are Kingswood's primary regulators.

7. Regardless of whether the Snyder Parties actually submitted those fabricated complaints, the fact remains that Kingswood has received $0 of the compensation it is due for connecting ML with the Transaction.

8. Therefore, Kingswood sues the Snyder Parties for stripping Kingswood of over $1.245 million of earned compensation—which they did solely because Mr. Snyder is anti-Semitic.

## The Parties, Jurisdiction, and Venue

9. Plaintiff Kingswood Capital Partners LLC is a Nevada limited liability company with principal places of business in San Diego, California and Stockbridge, Georgia.

10. Plaintiff Benchmark Investments, LLC is a Nevada limited liability company with principal places of business in New York, New York and Stockbridge, Georgia.

11. ML is a Pennsylvania corporation with principal places of business in Miami, Florida and Pittsburgh, Pennsylvania.

12. Mr. Snyder is a resident of Pennsylvania.

13. Upon information and belief, Mr. Snyder owns 50% of ML and founded it with non-party Jimmy Milliron, who owns the other 50%.

14. ML's website advertises that Mr. Milliron is its "Co-Founder, President, and Board Member."

15. ML's website does not advertise or otherwise mention Mr. Snyder.

16. The Snyder Parties largely directed their negotiations, contracts, and communications to Kingswood's New York-based personnel and Manhattan office.

17. Pursuant to a May 2021 Office of Supervisory Jurisdiction ("**OSJ**") agreement executed by non-party "**EF Hutton**," its registered representatives are independent contractors who have contracted for the ability to operate under Benchmark Investments, LLC's FINRA supervisory licenses.

### The Client Agreed to Pay a $9 Million Transaction Fee

18. In late March 2022, EF Hutton asked Kingswood to find an insurer that could help execute the Transaction.

19. In exchange for a promised referral "**Fee**," Kingswood presented the opportunity to ML and secured ML's participation in the Transaction.

20. By its April 29, 2022 closing, the Transaction had grown from $180 million to a $400 million, including a $380 million loan.

21. As compensation for arranging the Transaction, the "**Client**" agreed to pay $9 million total to the four separate financial services groups that had worked on the Transaction: EF Hutton, ML, Kingswood, and non-party "**Camshaft**" Capital Fund, LP (together, the "**Transaction Team**").

22. EF Hutton was to receive 55% of the $9 million Fee, while the other three groups would each receive 15%, excluding the $700,000 of Transaction expenses split pro-rata.

23. The Transaction Team expected that the fee would be paid in two steps: (1) the Client would pay Camshaft and then (2) Camshaft would pay Kingswood, ML, and EF Hutton.

24. While Kingswood was not active in structuring the Transaction—its role was largely limited to introducing ML and Camshaft—Camshaft and its attorneys appeared to keep open communication with Kingswood throughout April 2022, as they negotiated, structured, and implemented the Transaction.

25. For example, Camshaft continued to include Kingswood on communications with the Transaction Team and its members' lawyers, including emails that sent draft Transaction documents.

**Shortly Before the Transaction Closed, Kingswood was Cut out of the Deal**

26. But by April 27, 2022—as the Transaction was about to close and the Transaction Team was supposed to receive its fees—Kingswood stopped receiving communications regarding the Transaction and its status.

27. On April 29, 2022, the Transaction closed.

28. Camshaft received the $9 million that it was supposed to share with Kingswood, ML, and EF Hutton.

29. Kingswood, however, did not receive its Transaction compensation.

30. In mid-May 2022, Kingswood attempted to discuss its missing Transaction compensation with Camshaft.

31. Camshaft refused to discuss the Transaction or Fee with Kingswood.

5

32. Kingswood learned that by April 26, 2022, Camshaft, EF Hutton, and ML had executed a non-disclosure agreement ("**NDA**") that supposedly prohibited them from discussing the Transaction with Kingswood.

**Mr. Snyder Responded to Kingswood's Fee Inquiry by Spewing Anti-Semitic Filth**

33. Kingswood continued to try to understand why it had not received its Fee.

34. By early June 2022, Kingswood attempted to discuss the Fee with ML.

35. Kingswood had no reason to believe these discussions would be contentious.

36. After all, Kingswood had brought ML into the deal—not vice-versa.

37. On June 3, 2022, Kingswood Managing Director Douglas Blake left Mr. Snyder a voicemail to inquire about Kingswood's missing compensation.

38. Mr. Snyder responded by claiming that Kingswood had been paid and ML had not.

39. Without evidence or even explanation, Mr. Snyder claimed, "[t]he only entity or person that got screwed here is Miami Life as Kingswood received the commissions."

40. 17 minutes later, Kingswood attempted to clarify ML's apparent misunderstanding of the facts:

> Unfortunately Camshaft did not honor the attached Deal Summary, to the best of my knowledge. I have no knowledge of what actually transpired because EF Hutton has an NDA with Camshaft and per Jimmy [Milliron] you have an NDA with Camshaft. I can only speculate, but as I am not a registered principal at my firm or named party in any of these transactions I have no formal knowledge and would not be in a position to acknowledge or dispute anything.

41. In response to this three-sentence email, Mr. Snyder wrote:

Shameful that Benchmark has not asked for Miami Life's wiring instructions, my attorneys are gonna have a field day serving you and your Jew boss discovery that's gonna delete you guys (sound familiar either than this isnt a baseless threat it's a fact). Hope your check book can keep up to your NYC big pussy mouths you pint ass little piece of sidewalk gravels.

Miami Life wants $1 Million to settle and we will be looking for 2.5x in court. Enjoy Asswipes

My litigator is a major asshole. He will burn BURN "dickbench" DOWN !!!!!!!



42. Eight minutes later, Mr. Snyder changed the email thread's subject line from "Camshaft referral" to "FINRA AUDIT Re: Camshaft referral" and wrote, "Notice I changed the Subject. I am calling them on Wednesday you fucks."

43. Three minutes later, Mr. Snyder again responded to his own email, again changed the email's subject line—this time to "SEC AUDIT. Re: FINRA AUDIT Re: Camshaft referral"—and wrote:

[EXTERNAL SENDER]

Dear FINRA and the SEC, these guys are total crooks and they just violated major laws. I am a witness.

Have fun you Jew little pieces for fucking gravel (actually gravel can be sold….you guys are like lint in the drier machine). You started shit wit [sic] the wrong amigo you scum bags. And guess what, I have way more friends in this industry that you'll ever have and I won't do business with you guys ever again due to non compliance issues as you guys are felons

44. Neither of the Snyder Parties ever explained why Mr. Snyder claimed that Kingswood personnel are "total crooks" or "felons," how they "violated major laws," or how Mr. Snyder is "a witness."

45. Nor did the Snyder Parties explain what "you Jew little pieces for fucking gravel" means or why being "Jew little pieces" is in any way relevant to ML's supposed failure to receive its own Fee.

46. Needless to say, the Snyder Parties also failed to explain how or why they would "have a field day serving your Jew boss discovery that's gonna delete you guys (sound familiar [ . . . ])."

47. Kingswood did not respond to any of these emails.

48. Yet on June 8, 2022, Kingswood received a letter from ML's lawyer with the subject line "**Cease and Desist**," which accused Kingswood! Of harassing the Snyder Parties!:

> It is our understanding that Doug Blake, an employee/agent of Kingswood Capital Partners [], has been engaging in harassing and threatening conduct, over a period of weeks, with regard to [ML's brokerage affiliate] NBA, ML and their executives. Specifically, it is our understanding that Mr. Blake has been contacting NBA's and ML's executives, multiple times per day, threatening to interfere with existing business relationships, to defame NBA, ML and its executives to the business and financial community and threatening to interfere with future business relationships of NBA and ML. It is also our understanding that it has been made clear, by Mr. Blake, that this harassing conduct will cease and the threats will not be followed through on if NBA and/or ML pays money to Kingswood. It is also our understanding that other employees of Kingswood engaged in similar conduct. These comments were witnessed by individuals other than the executives of NBA and ML.

49. Following the Snyder Parties' lead, ML's lawyer did not bother providing any evidence or explanation of whom, exactly, Mr. Blake supposedly was contacting, how he supposedly was "threatening to interfere with existing" or "future business relationships," what "defamatory" statements Mr. Blake was making, or which "other employees" were "engag[ing] in similar conduct."

50. Perhaps ML's lawyer believed that Kingswood might be accusing the Snyder Parties of anti-Semitism?

51. But, of course, truth is an absolute defense. See, e.g., Curtis Pub. Co. v. Butts, 388 U.S. 130, 151–62 (1967); Panghat v. N.Y. Downtown Hops., 85 A.D.3d 473, 473–74 (1st Dep't 2011).

52. Moreover, instead of identifying any actual harm that Mr. Blake's supposed statements had caused, that letter concluded:

> Finally, in light of Kingswood's conduct, my client is willing to cooperate in unwinding the existing business relationship between NBA, ML and Kingswood, subject to execution of a mutually acceptable written agreement. If you would like to begin that process or have questions regarding this letter, please feel free to contact me or have your counsel do so.

53. Despite Mr. Snyder's promises, the June 8 letter suggests that his litigator is not, in fact, "a major asshole."

54. However, Kingswood still has not received its $1.245 million fee.

55. There is no good reason why Kingswood has not received its fee.

56. Nobody has ever complained that Kingswood failed to provide its agreed-upon services.

57. Nor has anyone—not even the Snyder Parties—ever claimed that Kingswood did not earn its Fee.

58. Mr. Snyder's anti-Semitism appears to be the only problem that anybody has with Kingswood.

59. Therefore, the evidence available to Kingswood suggests that the **only** reason it has not been paid is because the Snyder Parties—motivated solely by Mr.

Snyder's anti-Semitism—convinced Camshaft to break its promise to pay Kingswood's $1.245 Million Fee.

### The Snyder Parties Weaponized Millennia of Anti-Semitism to Strip Kingswood of Its $1.245 Million Fee

60. The Snyder Parties are not the first people who have baselessly blamed Jews for their own misfortune—particularly when it comes to financial matters.

61. For millennia, anti-Semites have painted Jewish people as inherently greedy, dishonest, and untrustworthy, from ancient, self-serving mistranslations of the New Testament to the Inquisition's mass expulsions to Shakespeare's Shylock to the Russian Empire's pogroms to the Holocaust's genocide of six million Jews.

62. Anti-Semitism remains alive and well in today's United States, continuing to comprise about 60% of all religiously-motivated hate crimes identified by the Federal Bureau of Investigations.

63. In the 20th century, the Ku Klux Klan ("**KKK**") recruited new members by scapegoating not only African Americans, but also Jewish Americans.

64. For example, after the lynching of falsely-accused, prominent Atlanta businessman Leo Frank, the KKK claimed that its membership had skyrocketed to four million members—far more than the total number of Jewish Americans during the same time period.

65. In 2017, far-right extremists again marched with torches to terrorize Jews, gathering in the college town of Charlottesville, Virginia, to chant, "Jews will not replace us!"

66. Last month, a man invoked the same "Great Replacement" conspiracy theory to justify his massacre of 10 people as they shopped for groceries in an African American neighborhood of Buffalo, New York.

67. The single deadliest attack against U.S. Jews occurred just three years ago—in a historically Jewish neighborhood of Mr. Snyder's own town, Pittsburgh—where a single man entered the Tree of Life Synagogue and killed eleven and wounded six elderly parishioners, including several Holocaust survivors.

68. Today, terrorists so regularly target Jewish synagogues that many now offer regular anti-terrorism trainings to prepare their communities to protect themselves from violent attacks during Sabbath services.

69. Jewish synagogues also tend to spend significantly more resources on security guards, barricades, and other protective measures than other houses of worship do.

70. In 2019, the U.S. Senate Homeland Security and Governmental Affairs Committee launched the Senate Bipartisan Task Force for Combating Anti-Semitism.

71. The same year, the U.S. Department of Justice hosted a Summit on Combating Anti-Semitism; in 2020, it sponsored a program specifically focused on web-based anti-Semitism.

72. Yet American anti-Semitism appears to be getting worse, not better.

73. In 2020, nearly one in four American Jews reported being the target of an Anti-Semitic verbal or insult, and three percent reported being the target of an anti-Semitic physical attack.

74. That same survey found that over the past year, 39% of American Jews had changed their behavior out of fear of anti-Semitism.

75. Nationwide, there were 2,717 anti-Semitic incidents of assault, harassment, and vandalism in 2021: 34% more than the previous year, and the highest number since tracking began in 1979.

76. Despite—or perhaps because of—New York's relatively large Jewish population, the trend is even worse in our home state.

77. New York State had 325% more anti-Semitic assaults in 2021 than in 2020.

78. As in the rest of the country, this is the highest-ever number of recorded anti-Semitic assaults in New York State.

79. Moreover, there were more anti-Semitic assaults in the single borough of Brooklyn—which has a large population of highly visible and religious Jews—than anywhere else in the United States.

80. Today, the U.S. Attorney's Office for the Western District of Pennsylvania—the home of both ML and Mr. Snyder, and which includes Pittsburgh—names its "Combating Anti-Semitism Initiative" at the very top of its "Programs" page, and observes:

> In the last 18 months, hate crimes against Jews have increased with shocking regularity and violence. Armed attackers have assailed Jewish worshippers in synagogues, shoppers in a kosher Jewish market, and Hanukkah celebrants in a rabbi's home. Other incidents targeting the Jewish people have included vandalism of Jewish synagogues, schools, and cemeteries. The Department of Justice and the United States Attorney's Office for the Western District of Pennsylvania are committed to addressing and combating hate crimes against Jews and ensuring the safety of our Jewish communities. If you have been a victim or have knowledge of an anti-Semitic hate crime in the Western District of Pennsylvania, please

contact our office's point of contact, Assistant U.S Attorney Jessica Lieber Smolar, at 412-644-3500.

81. Perhaps most relevant to this Action, anti-Semites like the Snyder Parties claim that Jews—who total just 0.2% of the world's population, no thanks to the Holocaust—control finance.

82. Anti-Semites like the Snyder Parties claim that Jews are at fault for any and all financial woes that befall others.

83. This has not been a mere fringe view.

84. For example, Henry Ford blamed Jews for World War I, claiming that "International financiers are behind all war. They are what is called the international Jew: German Jews, French Jews, English Jews, American Jews. I believe that in all those countries except our own the Jewish financier is supreme [ . . . ] here the Jew is a threat."

85. Too many Americans still profess that financiers like the Rothschilds and George Soros (and, apparently, Kingswood) exercise some nefarious secret control over the world economy.

86. For example, in 2016, media personality and conspiracy theorist Alex Jones told his millions of viewers, "I mean it's not that Jews are bad, it's just that they are they head of the Jewish mafia in the United States. They run Uber, they run the health care, they're going to scam you, they're going to hurt you."

87. Anti-Semites do not limit their abuse to victims who actually are Jewish.

88. For example, while running for President in 2016, Donald Trump tweeted an image that pasted Hillary Clinton's face on a pile of hundred-dollar bills, accompanied by a red Star of David imprinted with the words, "Most Corrupt Candidate Ever!"

89. Anti-Semitic scapegoating even reared its head during the 2021 GameStop trading frenzy, republishing the same age-old stereotypes on brand-new media like Reddit, Twitter, and Telegram:

- "Sorry to beak it to you guys but the Hunt brothers tried this and the US government literally stepped in and did a Robinhood Halt to prevent them making money. End of the day it's the Jews that control us;"
- "[C]an I just come out and say it? Wall street is run by the jews;"
- "The Rothschild company i:e [sic] Goldman Sachs, Citigroup, JPMorgan Chase losing Trillions and the Satanic group are not happy;"
- "Put Rothschild Balls in the vice [sic] with this one!!! The dirty vile cunts in the Banking Cabal must be brought down one retarded options purchase at a time! IN! PEASANTS UNITE;"
- "Billionaire kike parasite Leon Cooperman fake cries because his jew brain is overloaded with the fact he might lose money that he stole. This is why Germany kicked these 'people' out;"
- "[ . . . ] It's not about the money, forget the money. Losing the money is worth it to put the hurt on these rich jew scumbags who think they're above reproach [ . . . ] Hit them in the only thing they care about. The shekels;"
- "Tbh idc [to be honest I don't care] if [I] don't make that much money on gme [Gamestop] as long as that jewish Melvin fund [a hedge fund that held a large short position] goes bankrupt I'll be happy lol [laughing out loud]."

90. In other words, the Snyder Parties' anti-Semitism is neither original nor benign.

91. It is not even profitable: there is no indication that cutting Kingswood out of the Transaction Fee created any windfall for the Snyder Parties.

92. Indeed, the Snyder Parties complain that they never received their own Fee.

93. Instead, this appears to be the rare instance in which interference was motivated by nothing but hate and spite.

94. Not even the Snyder Parties' June 8 Letter claims that Kingswood owes them any part of the Fee.

## COUNT I
## Tortious Interference with Contract

95. Kingswood incorporates its foregoing allegations.

96. Kingswood and Camshaft contracted for Kingswood to receive $1.245 million for referring ML.

97. All conditions precedent to Kingswood's receipt of its Fee, including Kingswood's own services and Camshaft's receipt of the full Fee, occurred.

98. Nobody has ever claimed that Kingswood failed to satisfy its contractual obligations or otherwise is not entitled to its Fee.

99. Instead, Camshaft simply refuses to pay or even communicate with Kingswood.

100. Mr. Snyder's vitriolic, anti-Semitic emails are the only communications that even come close to explaining why Kingswood has not received its fee.

101. Upon information and belief, the Snyder Parties influenced and convinced Camshaft to cut Kingswood out of the Transaction and refuse to pay its Fees.

102. The Snyder Parties did not do this because they would gain any financial advantage.

103. They simply are anti-Semitic and hate Jews.

104. The Snyder Parties' tortious interference has damaged Kingswood in an amount to be revealed during discovery and proven at trial, currently estimated to be no less than $1.245 million before interest, costs, and fees.

## COUNT II
## Tortious Interference with Prospective Business Relations

105. Kingswood incorporates its foregoing allegations.

106. In the alternative, Kingswood has no enforceable Transaction Fee contract.

107. Kingswood did, however, reasonably expect that it would be paid a 15% Fee on the Transaction.

108. The Snyder Parties interfered with Kingswood's rightful expectation of its Fee.

109. The Snyder Parties had no good reason to interfere with Kingswood's Fee.

110. The Snyder Parties' tortious interference has damaged Kingswood in an amount to be revealed during discovery and proven at trial, currently estimated to be no less than $1.245 million before interest, costs, and fees.

## COUNT III
## Intentional Infliction of Emotional Distress

111. Kingswood incorporates its previous allegations.

112. The Snyder Parties' conduct epitomizes "extreme and outrageous conduct."

113. Given anti-Semitism's predictable and seemingly-intractable tropes, the Snyder Parties knew or should have known that their conduct would cause Kingswood severe emotional distress.

114. The Snyder Parties' conduct is so "atrocious" and "extreme in degree" that it "go[es] beyond all possible bounds of decency" and is "utterly intolerable in a civilized community."

16

115. The Snyder Parties have caused Kingswood actual emotional distress: a significant proportion of its employees and officers, including its Chief Executive Officer and Managing Partner, are Jewish.

116. The Snyder Parties' intentional infliction of emotional distress has caused Kingswood damages in an amount to be revealed during discovery and proven at trial.

## COUNT IV
## Quantum Meruit

117. Kingswood incorporates its foregoing allegations.

118. ML was only able to participate in the Transaction and earn its own $1.245 million Fee because Kingswood introduced it to Camshaft.

119. ML accepted Kingswood's services, and agreed that ML and Kingswood should each be entitled to 15% of the total Fee.

120. Yet Kingswood has not received its Fee.

121. It would be inequitable to allow the Snyder Parties to retain its own Fee while Kingswood receives nothing.

122. The Court should award restitution in a just and equitable amount to be revealed during discovery and proven at trial, currently estimated to be no less than $1.245 million before interest, costs, and fees.

## RELIEF REQUESTED

WHEREFORE, Kingswood demands judgment as follows:

i. Damages and / or restitution in an amount to be revealed during discovery and determined at trial, currently believed to be $1.245 million before interest, fees, and costs;
ii. Attorney's fees;
iii. Costs and disbursements; and
iv. Such other and further relief as is just and proper.

## JURY DEMAND

Kingswood demands a jury trial.

Dated: June 16, 2022
        New York, New York

                                GUSRAE KAPLAN NUSBAUM PLLC

                                /s/ Martin H. Kaplan
                                Martin H. Kaplan
                                Kari Parks
                                120 Wall Street, 25th Floor
                                New York, New York 10005
                                (212) 269-1400
                                mkaplan@gusraekaplan.com
                                kparks@gusraekaplan.com

                                *Attorneys for Plaintiff*